## IN THE SUPREME COURT OF THE STATE OF IDAHO

### Docket No. 50523

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, September 2023 Term |
| | ) | |
| v. | ) | Opinion filed: February 8, 2024 |
| | ) | |
| WILLIAM NORWOOD PARSONS, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Samuel Hoagland, District Judge.

The judgment of the district court is <u>vacated and remanded</u>.

Erik R. Lehtinen, State Appellate Public Defender, Boise, for Appellant. Elizabeth Allred argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Mark Olson argued.

_____

MOELLER, Justice.

Defendant William Parsons was found guilty by an Ada County jury on three felony counts of lewd conduct with a minor under sixteen and one misdemeanor count of disseminating harmful material to a minor. On appeal, he challenges the trial court's admission of two recorded interviews with the victim, who did not testify. He argues the video evidence was testimonial and admitted in violation of his Sixth Amendment rights under the Confrontation Clause because he was afforded no opportunity to confront his accuser. We agree that the videos were submitted to the jury in violation of the Sixth Amendment. Accordingly, we vacate the conviction and remand for further proceedings consistent with this opinion.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant "Bill" Parsons was convicted by a jury of three felony counts of lewd conduct with a minor under sixteen, I.C. § 18-1508, and one misdemeanor count of disseminating harmful

material to a minor, I.C. § 18-1515. The offenses occurred between September 2018 and September 2019 while Parsons was living with his then-girlfriend and her daughter, K.B.[1] K.B. was four years old when Parsons moved in. While living together, Parsons would often watch K.B. in the afternoons between her return from daycare and her mother getting home from work. There was also a three-month period during the winter where Parsons watched K.B. full-time.

On September 8, 2019, K.B., then five years old, disclosed to her mother that she had been sexually abused by Parsons when the two of them were home alone together. K.B.'s disclosures occurred when her mother was taking K.B. to a friend's home for a play date. Mother and daughter were discussing "safe touching" in the car. K.B. then told her mother that Parsons had "touched her down there." K.B.'s mother asked clarifying questions and K.B. made additional disclosures indicating that Parsons had rubbed K.B.'s vagina with his fingers. She then took her daughter to the emergency room where K.B. received medical care and was diagnosed with a urinary tract infection. She and her mother also met with a social worker and made contact with local police who were dispatched to the hospital. That night, K.B. and her mother moved out of their shared apartment with Parsons.

Law enforcement later set up an appointment for K.B. with St. Luke's Children at Risk Evaluation Services ("CARES") at its Regional Medical Center in Boise, Idaho. CARES provides evaluations and treatment for children reporting abuse and neglect. It also specializes in forensic interviewing. A CARES evaluation generally consists of three stages: (1) a forensic interview with a medical social worker, (2) a psychosocial assessment by the same social worker, and (3) a medical examination conducted by a certified child abuse pediatrician. All interviews are conducted in accordance with the protocols of the National Institute of Child Health and Human Development ("NICHD"). A CARES interview can be observed by referring agents and medical providers through a closed-circuit television system to reduce the number of times a child must make traumatic disclosures.

On October 2, 2019, about 24 days after K.B.'s initial disclosure, K.B. met with Lara Foster, a medical social worker, for her CARES interview. Foster began the meeting by telling K.B. "that after speaking with her, she would see a nurse, and that it was their job to make sure

---

[1] To protect the privacy of the minor child, initials will be used in place of her name.

that the child's body is safe and healthy." As Foster established rapport with the child, K.B. told Foster she was "the best doctor ever." Foster responded by telling K.B. she was actually a social worker who works with nurses and doctors. Foster reminded K.B. that she would meet with a doctor after they talked. The investigating officer was able to watch the full interview through a closed-circuit television monitoring system.

During the interview, Foster asked a range of questions pursuant to NICHD protocols that would elicit statements from K.B. so that Foster, the CARES medical staff, and law enforcement would "fully understand what[] happened" to K.B. The questioning elicited multiple disclosures of sexual abuse. K.B. described instances where Parsons would remove her pants and rub her vaginal area with his hand, perform cunnilingus on her, or would force K.B. to use her hands or mouth on his penis until he ejaculated. K.B. also stated that Parsons showed her pornographic videos, including child pornography, on the television in her mother's bedroom.

Following the CARES interview, K.B. underwent a psychosocial assessment and medical examination. Dr. Amy Barton, who performed K.B.'s medical exam, watched both of K.B.'s interviews via closed-circuit television to gather information that would assist her medical evaluation. Although no physical injuries were found in the examination, specialized counseling services were recommended.

On December 10, 2019, a grand jury indicted Parsons on all counts. K.B. testified in the grand jury proceedings, restating the same disclosures of abuse she had made to Foster in the CARES interview. An arrest warrant immediately issued. A few days later, on December 17, 2019, K.B. made new disclosures to her mother regarding sexual abuse by Parsons. Her mother reported that while K.B. was looking for her cat under her mother's bed, she saw a box containing a pink vibrator, which K.B.'s mother and Parsons had used in their relationship. K.B. told her mother she found something Parsons used "to hurt her," describing and referencing the vibrator.

A second CARES interview was set up for January 9, 2020, and K.B. was again interviewed by Foster. An investigating officer watched the interview via closed-circuit television. K.B. told Foster that the vibrator was pink, had buttons, turned on and off, and made a motor noise. She drew a picture of it for Foster and explained that Parsons would use the device to "tickle" her "private part." K.B. also repeated many of her earlier disclosures of sexual abuse by Parsons. At one point, K.B. told Foster that Parsons' penis touched her, and the officer watching the interview

3

flashed a light to interrupt the interview's process. On a break from the questioning, the officer asked Foster to direct her questions to clarify from K.B. what she meant when she said that Parsons' penis "touched" her. At another point in the interview, K.B. danced around and told Foster that Parsons had been put in jail because of her disclosures.

Following his arrest, Parsons pleaded not guilty and waived his right to a speedy trial. On March 17, 2020, the State filed a notice of intent to introduce K.B.'s CARES interview and medical records from October 2, 2019, at trial, arguing the materials—though hearsay—were admissible under the medical diagnosis and treatment exception under Idaho Rule of Evidence 803(4). Anticipating Parsons would raise an argument under the Confrontation Clause, the State added that it "anticipates that K.B. will testify at trial" but argued that if she did not, the CARES interviews were still admissible as they were "generally nontestimonial." Parsons responded that he "[had] no objection to the State using the CARES report to supplement [K.B.'s] testimony," but objected to the interviews' admission in the event K.B. did not testify. He argued that this would be a violation of the right to confront and cross-examine his accuser. Of note, the State explained in its motion that it "[was] not seeking to introduce the interview video from the January 9, 2020 CARES interview."

The district court overruled Parsons' objection and determined that the CARES interview and medical records from October 2, 2019, were admissible because their primary purpose was to "provide medical care to K.B." rather than to "establish or prove past events that were potentially relevant to criminal prosecution." In reaching its decision, the court emphasized the factors of K.B.'s age, her lack of familiarity with the criminal justice system, that the interviews were conducted by a social worker, and that the purpose of the interviews and subsequent exams were to ensure K.B. was "safe and healthy." The court explained:

> K.B. is only five years old and there is no evidence (or assertion by the Defendant) that she is familiar with the criminal justice system or intended her statements to be a substitute for trial testimony. On the contrary, as in *Ohio v. Clark*, it is likely that a young child in K.B.'s "circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all." *See Clark*, 135 S. Ct. at 2182. In addition, the interviews were conducted by CARES employees, not law enforcement. K.B. was informed that the purpose of the interviews and the medical examination were to make sure that she was safe and healthy. Considering all of these factors, the [c]ourt concludes that K.B.'s statements made during the course of the CARES interviews and medical

4

examination were non-testimonial. Therefore, the introduction of these materials (regardless of K.B.'s availability) does not violate the Defendant's rights under the Confrontation Clause.

The district court also noted in its decision that "[s]hould the Defendant have objections to specific portions of the CARES interviews or record, he should so object at trial."

On February 25, 2021, about two weeks before trial, Parsons filed a motion to continue so that he could pursue evidence of an alternate perpetrator. Defense counsel explained to the district court that Parsons informed him that K.B.'s "biological father was possibly a convicted juvenile sex offender, or least that was what [Parsons] had been told by [K.B.'s mother]." Parsons claimed that he raised the issue with his attorney a year prior, but counsel stated he did not remember that conversation. Parsons explained that K.B. stated in the CARES interview that she was three years old at the time of her abuse, which is when she was living with her biological father. In his motion, Parsons told the court that he wanted "to seek to unseal the biological father's juvenile sex offense case, to subpoena any records from the department of health and welfare regarding any alleged abuse that the biological father may have inflicted on the victim, and to do any other investigations regarding this new information in order to prepare the Defendant's defense." The district court denied this motion, determining that the defense could not assert an alternate perpetrator theory, especially this late and close to trial, but they could present an alibi defense.

Parsons' trial took place from March 8 to March 10, 2021. The State listed K.B. as a witness and obtained the district court's approval for a courthouse support dog to accompany K.B. during her testimony, a motion which was granted to alleviate the child's anxiety. However, the State later opted not to have K.B. testify during the trial. Instead, the State offered both of her CARES interviews as evidence under Idaho Rule of Evidence 803(4). The district court admitted both interviews and allowed them to be shown to the jury without objection by the defense.

For the State, K.B.'s mother, the investigating officer, and K.B.'s daycare provider each took the witness stand to corroborate the disclosures K.B. made in the CARES interviews. During the mother's testimony, Parsons objected to a statement concerning an incident with K.B. where the child spontaneously compared a popsicle she was eating to Parsons' genitals.

THE WITNESS: I was doing the dishes. And I hear her come up behind me, because I had just given her a popsicle. And she said, "Mom, look, it looks like a penis. It looks like Bill's penis."

Parsons objected to this portion of the mother's testimony, arguing it was hearsay. The district court overruled his objection.

Foster also testified for the State, explaining her training, the CARES interview process, and that the closed-circuit system was available for referring agencies "to learn about what has happened to the child." She explained:

> Obviously there are varying reasons and there are these different entities who have different reasons and motivations to learn about what has happened to the child.
>
> We need to be sure that this child is not further traumatized through this process, that we're able to fully understand what's happened. And so reducing the number of times the child is talked to and making sure that the person who does talk to the child is trained, educated and knows an appropriate way to go about it.
>
>   . . . .
>
> . . . we [CARES] understand why they [law enforcement] need to know this information. So they're at the table, they're watching this interview, but if they want questions to be asked that are not appropriate or do not fit within the scope of what we're doing for this child or just is not appropriate to ask the child, then those questions are not asked.

When asked about the lights flashing during the second interview with K.B., Foster explained that the detective wanted clarification on K.B.'s statements that Parsons' penis touched her.

After the State rested, Parsons filed a Idaho Criminal Rule 29 motion for judgment of acquittal, arguing that there was insufficient evidence to sustain a conviction. His motion rested in large part on the fact that the CARES videos had been admitted even though K.B. did not testify. The district court denied the motion, explaining that the weight of evidence and the credibility of witnesses were matters for the jury. Parsons then took the witness stand and testified that he was innocent. He explained that he had a "surrogate father" relationship with K.B. While recognizing that K.B. was undoubtedly abused, the defense maintained that Parsons was not the one who abused her.

During closing arguments, the State explained why it did not call K.B. as a witness. The State told the jury that it was "not about to put [K.B.] through more trauma and mak[e] her recount sexual abuse in a room full of 12 strangers," when the CARES interviews already uncovered the evidence of child abuse "in the least traumatic way possible for the child." The State also noted that "the defense has the same exact subpoena power as the State has" and could have called K.B. as a witness.

6

The jury found Parsons guilty on all charges. The district court then sentenced Parsons to concurrent 40-year sentences, with 20 years fixed, on his three felony offenses for lewd conduct with a minor. A shorter concurrent sentence was imposed for the misdemeanor offense of disseminating harmful material to a minor.

Parsons appealed and the Idaho Court of Appeals affirmed his judgment of conviction. The Court of Appeals determined that the admission of the CARES interviews did not violate Parsons' rights under the Confrontation Clause because the primary purpose of the CARES interview was for K.B.'s physical health and safety. Parsons then timely filed a petition for review with this Court, arguing that the Court of Appeals' decision is in direct conflict with *State v. Hooper*, 145 Idaho 139, 176 P.3d 911 (2007), and that the CARES interviews were testimonial and admitted in violation of the Confrontation Clause. Parsons also maintains that the Court of Appeals' decision was clearly in error because "it relied upon evidence that did not exist" in the record. For example, he notes that the Court of Appeals' opinion references and relies on trial testimony from "K.B.'s grandmother," who never testified at Parsons' trial. This Court granted the petition for review.

## II. STANDARDS OF REVIEW

When a case comes before this Court on a petition for review from the Court of Appeals, "this Court gives serious consideration to the views of the Court of Appeals, but directly reviews the decision of the lower court." *State v. Ochoa*, 169 Idaho 903, 912, 505 P.3d 689, 698 (2022) (quoting *State v. Oliver*, 144 Idaho 722, 724, 170 P.3d 387, 389 (2007)).

The question before this Court is whether the admission of a recorded CARES interview violated the defendant's right to confront an adverse witness under the Confrontation Clause, as contained in the Sixth Amendment of the United States Constitution. As a constitutional issue, this is a question of law freely reviewed by this Court. *See State v. Stanfield*, 158 Idaho 327, 331, 347 P.3d 175, 179 (2015); *Hooper*, 145 Idaho at 142, 176 P.3d at 914. However, even when a constitutional right is asserted, this Court defers to the trial court's factual findings unless those findings are clearly erroneous. *Hooper*, 145 Idaho at 142, 176 P.3d at 914.

## III. ANALYSIS

Parsons asserts several errors on appeal, asking this Court to vacate his conviction and remand for a new trial. He first argues that "the district court violated his Sixth Amendment right to confront the witnesses against him by admitting K.B.'s CARES interview." Citing to *Hooper*,

145 Idaho 139, 176 P.3d 911, Parsons argues that K.B.'s statements in the interview were testimonial in nature because "they were made for the primary purposes of criminal investigation and prosecution." The State responds that the Confrontation Clause only applies to testimonial statements and contends K.B.'s interviews were conducted for medical treatment and diagnosis. While not addressed by the parties in their briefing, save for a footnote from the State, there is an additional preservation issue that was discussed by the Court of Appeals as to whether Parsons objected to the admission of both CARES interviews or only to the first. As that issue impacts the scope of Parsons' arguments before this Court, we will address it first.

### A. Parsons failed to object to the admission of the second CARES interview, thus waiving that issue for appeal.

"This Court will not consider issues raised for the first time on appeal." *State v. Jeske*, 164 Idaho 862, 868, 436 P.3d 683, 689 (2019) (citation omitted). This Court recently held that "a party preserves an issue for appeal by properly presenting the issue with argument and authority to the trial court below and noticing it for hearing . . . ." *State v. Miramontes*, 170 Idaho 920, 924–25, 517 P.3d 849, 853–54 (2022). A party may also preserve an issue for appeal when the trial court issues an adverse ruling. *Id.* As we have explained:

> To properly preserve and present to this [C]ourt claimed errors of this nature, timely and proper objection should be made, first so the trial court may have an opportunity to prevent or if possible eradicate such error by admonition or instruction, and second, that there be adverse ruling or action by the trial court for review by this court.

*Id.* at 925, 517 P.3d at 854 (alteration in original) (quoting *Stewart v. City of Idaho Falls*, 61 Idaho 471, 478–79, 103 P.2d 697, 700 (1940)). Where "a party fails to preserve an issue for appeal via a timely objection, the issue will only be reviewed and reversed on appeal if it constitutes fundamental error." *State v. Sheahan*, 139 Idaho 267, 280–81, 77 P.3d 956, 969–70 (2003) (quoting *State v. Lovelass*, 133 Idaho 160, 167, 983 P.2d 233, 240 (Ct. App. 1999)).

Parsons did not object to the admission of either CARES interview during his trial. He expressly consented to each admission and their publications to the jury. However, prior to trial, he did object to the admission of the first "CARES report" from October 2, 2019, when the State brought its motion in limine. Parsons argues that his pretrial objection implicitly extended to the second CARES interview from January 9, 2020. We do not agree.

The State's first motion in limine expressly stated that it was only seeking to introduce the first CARES interview. As the State explained in its motion: it "[was] not seeking to introduce the interview video from the January 9, 2020 CARES interview." Parsons' pretrial objection references the "CARES report" or "CARES interview" only in the singular. He filed the objection in response to the State's notice, which was only seeking to admit the first interview. While the district court's decision referred to "interviews" and "reports" in the plural, we do not agree that this changes Parsons' failure to object to the second interview's admission at trial because the plural usage by the court in its ruling plainly references only the medical, psychosocial, and forensic interviews and examinations conducted by CARES on October 2, 2019. There is simply no objection to the second interview to be found anywhere in the record. Indeed, the district court never made a ruling on the admissibility of the second interview because the issue was never presented to it before or during the trial.

Therefore, we conclude that the admissibility of the second CARES interview, lacking both an objection and an adverse ruling, has been waived for review on appeal. Parsons has also failed to raise fundamental error. Accordingly, we will limit the scope of our constitutional examination to the first CARES interview.

**B. By admitting the first CARES interview, the district court violated Parsons' rights under the Confrontation Clause because the primary purpose of the interview was investigatory rather than medical.**

Parsons alleges a violation of his Sixth Amendment right under the Confrontation Clause of the U.S. Constitution. The Idaho Constitution "does not contain a confrontation clause similar to that found in the United States Constitution; therefore, this issue is analyzed solely under the United States Constitution." *State v. Stanfield*, 158 Idaho 327, 332, 347 P.3d 175, 180 (2015). The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. Confrontation is a fundamental right that applies equally to state prosecutions. *Stanfield*, 158 Idaho at 332, 347 P.3d at 180. The U.S. Supreme Court has explained that the Confrontation Clause was directed "at the principal evil" of the "civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Crawford v. Washington*, 541 U.S. 36, 50 (2004). Thus, "[t]he Sixth Amendment must be interpreted with this focus in mind." *Id.*

9

Because the Confrontation Clause applies only "to 'witnesses' against the accused—in other words, those who 'bear testimony,' " the Confrontation Clause is restricted to "statements that are testimonial." *Stanfield*, 158 Idaho at 332, 347 P.3d at 180 (first quoting *Crawford*, 541 U.S. at 51; and then citing *Davis v. Washington*, 547 U.S. 813, 823–24 (2006)). " 'Testimony,' . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Crawford*, 541 U.S. at 51 (brackets in original) (quoting 2 N. Webster, An American Dictionary of the English Language (1828) (brackets in original)). Thus, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* The decision in *Crawford* "limited the Confrontation Clause's reach to testimonial statements and held that in order for testimonial evidence to be admissible, the Sixth Amendment 'demands what the common law required: unavailability and a prior opportunity for cross-examination.' " *Michigan v. Bryant*, 562 U.S. 344, 354 (2011) (quoting *Crawford*, 541 U.S. at 68). If the statement is determined to be testimonial, "then its admission is permitted only if the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant." *Stanfield*, 158 Idaho at 332, 347 P.3d at 180. If nontestimonial, the admissibility of a statement is governed by state and federal rules of evidence. *Bryant*, 562 U.S. at 359; *Stanfield*, 158 Idaho at 332, 347 P.3d at 180.

In *Crawford*, the United States Supreme Court did not provide an exhaustive definition or list of "testimonial" statements, but left formulating a comprehensive definition for "another day." 541 U.S. at 68. Instead, the Supreme Court provided a "core class" of testimonial statements, including ex parte in-court testimony or its functional equivalent, extrajudicial statements in formalized testimonial materials, and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 51–52. The Supreme Court has continued to build on this list over the years, most recently articulating that a statement is testimonial where "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'create an out-of-court substitute for trial testimony.' " *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (internal brackets omitted) (quoting *Bryant*, 562 U.S. at 358) (internal brackets omitted). Thus, "[w]hether a statement is testimonial is determined by looking at the statement's *primary purpose* and its similarities to traditional testimony." *Stanfield*, 158 Idaho at 332, 347 P.3d at 180 (emphasis added)

(citing *Davis*, 547 U.S. at 822). This "primary purpose" test requires a court to examine all the objective circumstances and determine whether "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Hooper*, 145 Idaho at 143–44, 176 P.3d at 915–16.

This inquiry is objective and wholly depends on "matters of objective fact." *Bryant*, 562 U.S. at 360. It does not delve into a subjective analysis of the statements and parties to establish the actual purpose or motive of the individuals involved in a particular encounter. *Id.* Thus, a court's relevant inquiry to determine the "primary purpose of the interrogation" is to assess "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* "[T]he most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Id.* at 358. There are compelling reasons for this restriction:

> Even where such an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair to the accused if they are untested by cross-examination. Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial.

*Id.*

For instance, in *Davis*, the U.S. Supreme Court distinguished nontestimonial statements from testimonial ones in the context of abuse victims through several objective factors. The facts in *Davis* established that there was an ongoing emergency where a woman called 911 to report a domestic disturbance with her former boyfriend, Davis, "usin' his fists" and "jumpin' on [her] again." 547 U.S. at 817–18. Important to the Court's analysis was that the victim described events as they were happening over a 911 call, the statements were informal, and the statements were elicited to resolve the present emergency. *Id.* at 827–28. Thus, the primary purpose of the statements made during the 911 conversation in *Davis* was to respond to an ongoing emergency— not to prepare testimony for a later trial. *Id.* This was in contrast to a simultaneous decision from the U.S. Supreme Court in *Hammon v. Indiana*, where the objective factors indicated the primary purpose for questioning a domestic abuse victim, by law enforcement, was to establish or prove past events potentially relevant to later criminal prosecution. 547 U.S. at 822. In *Hammon*, there

was no emergency in progress. The officer was establishing what *had* happened, rather than what *was* happening. It was a formal interrogation in the victim's living room and her husband was kept in a separate room by another officer. Finally, the statements recounted how potentially criminal past events began and progressed—a purpose "the testifying officer expressly acknowledged." 547 U.S. at 829–32.

As the Supreme Court has acknowledged, "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Bryant*, 562 U.S. at 358 (emphasis in original). When "making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Id.* at 358–59. Additionally, "the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation," as do the circumstances in which an encounter occurs. *Id.* at 367. Ultimately, the question before us is whether, in light of all the objective circumstances, "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Hooper*, 145 Idaho at 143–44, 176 P.3d at 915–16. *See also Clark*, 576 U.S. at 244 (citation omitted); *Bryant*, 562 U.S. at 357 (citation omitted). "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, 562 U.S. at 359.

Parsons points to *State v. Hooper*, where this Court previously addressed the question of whether videotaped statements made by a child during a forensic interview at a sexual abuse response center were testimonial for purposes of the Sixth Amendment. 145 Idaho at 141, 176 P.3d at 913. In *Hooper*, we recognized that "such interviews" can have a two-fold purpose: "medical treatment and forensic use," with statements made to medical professionals having "frequently been held to be nontestimonial when the primary purpose was treatment, even where police officers referred the child to the medical personnel." *Id.* at 145, 176 P.3d at 917. However, the *Hooper* Court ultimately determined that the child's statements in her forensic interview were testimonial and had been admitted by the trial court in error where the defendant had no opportunity to cross-examine the witness. *Id.* at 141, 145–46, 176 P.3d at 913, 917–18. This Court's decision turned on the primary purpose test as outlined in *Davis*, with the totality of the

12

circumstances "indicat[ing] that the interview was geared toward gathering evidence, rather than providing medical treatment." 145 Idaho at 145, 176 P.3d at 917.

In *Hooper*, a mother discovered her six-year-old child and the father locked in a bathroom, and she suspected sexual abuse had occurred. *Id.* at 140, 176 P.3d at 912. She contacted police and they arranged for a medical examination and forensic interview at the Sexual Trauma Abuse Response ("STAR") Center in Ontario, Oregon. *Id.* During the medical examination, a doctor discovered "breaking and swelling in the rectal area." *Id.* at 141, 176 P.3d at 913. A nurse and forensic interviewer then conducted a videotaped interview with the child while a detective observed the questioning from another room via a closed-circuit system. *Id.* The State later served notice of its intent to introduce the videotaped interview and the child's hearsay statements based on Idaho Rules of Evidence 803(24) and 804(5). *Id.* After the child was declared unavailable (having been unable to take the oath), the trial court admitted the videotaped interview over the defendant's objection. *Id.*

On appeal, several factors from these events were important to this Court in reaching its determination that the forensic interview in *Hooper* implicated the Confrontation Clause. *Id.* at 146, 176 P.3d at 918. In questioning the defendant, detectives told him that further action in the investigation would depend on what his daughter revealed in the STAR Center interview. *Id.* at 145, 176 P.3d at 917. The detective was able to watch the interview via a closed-circuit system. The nurse conducting the forensic interview informed the child that there was a camera in the room that would record everything, and that "her friend John [Detective Plaza] [was] watching to make sure that [she] remember[ed] to ask all the questions [she] need[ed] to ask." *Id.* The nurse also emphasized that the child needed to tell the truth. During the course of the interview, the nurse asked details about the event in question—including the identity of the perpetrator—but never inquired as to the child's medical condition. *Id.* At the interview's conclusion, the nurse left the room to consult with the detective and then returned to ask more questions. Physical evidence, including swabs, were taken at the end of the interview. Finally, while the interview occurred soon after the mother contacted police, this Court determined that there was "no evidence" that the interview was done to assist police in an ongoing emergency. *Id.* at 145–46, 176 P.3d at 917–18.

We agree with Parsons that *Hooper* is controlling here and that many of these same factors are present. For example, both cases dealt with a forensically trained interviewer conducting an

examination that was arranged, and observed, by law enforcement. K.B. and the child victim of *Hooper* were close to the same age (five and six years old, respectively). Both were taken by their mothers to a center specializing in treatment and evaluations for sexual abuse. Like in *Hooper*, Foster's questioning asked details about the alleged abuse, including the identity of the perpetrator, where acts of abuse occurred, how often acts were done, and so on. The interview's purpose was for CARES and law enforcement "to fully understand what's happened" to K.B. In short, Foster's questioning was not only used for diagnostic purposes, but was a mechanism to build a criminal case against Parsons, who had already been identified as the prime suspect 24 days earlier.

The timeline of K.B.'s treatment also places this case in line with *Hooper*. In *Hooper*, the medical examination preceded the child victim's forensic interview, which indicated the primary purpose of the nurse's later questioning was purely forensic and "would provide a substitute for the child's live testimony in court." 145 Idaho at 146, 176 P.3d at 918. In some contrast here, Dr. Barton observed K.B.'s interviews to better inform her upcoming medical examination and treatment of K.B., who underwent both physical and psychological evaluations. Importantly, however, K.B. had already received medical care at the emergency room when she first disclosed the abuse, nearly a full month before the CARES examinations. Not only was there no evidence of an ongoing medical emergency, K.B.'s interview occurred 24 days after she had already received medical attention. Hence, we cannot agree with the State's contentions—or the dissent's conclusions—that K.B.'s statements were made primarily for a medical purpose. Quite the opposite—the questioning was forensic and elicited to establish or prove past events potentially relevant to a later criminal prosecution. While K.B. may have referred to Foster as the "best doctor ever," and was assured that the CARES team would make sure K.B.'s body was "safe and healthy," these factors do not outweigh the evidence that K.B. was brought to CARES at the arrangement of law enforcement with a primary purpose of "gathering evidence, rather than providing medical treatment." *Id.* at 145, 176 P.3d at 917. This conclusion is reinforced by the fact that K.B. had already received medical care in the weeks prior, a factor that the dissent's analysis does not consider.

Our decision today is not altered by this Court's recent decision in *State v. Christensen*, 166 Idaho 373, 380, 458 P.3d 951, 958 (2020), or the United States Supreme Court's decision in *Ohio v. Clark*, 576 U.S. 237 (2015). Both decisions followed *Hooper* and dealt with hearsay

14

statements from a child—either in the context of hearsay exceptions (*Christensen*) or the Confrontation Clause (*Clark*). Both of these decisions are also cited by the parties as either controlling or inapplicable to the case at bar. While each provides guidance, neither abrogates *Hooper* or dictates that we vary from its application.

In *State v. Christensen*, we examined the admissibility of two recorded CARES interviews—both performed by Lara Foster, the same interviewer here—of twin sisters who were inappropriately touched by their step-grandfather. 166 Idaho at 375, 458 P.3d at 953. We ultimately concluded that the twins' statements were admissible under Idaho Rule of Evidence 803(4) because they had been made for the purpose of medical diagnosis or treatment. *Id.* at 376–78, 458 P.3d at 954–56 (discussing *State v. Kay*, 129 Idaho 507, 518, 927 P.2d 897, 908 (Ct. App. 1996)). Importantly, *Christensen* did not implicate the Confrontation Clause because both girls testified at trial. *Id.* at 376, 458 P.3d at 954. The decision concerned only whether the district court abused its discretion in admitting the CARES interviews under the hearsay exception for statements made for the purpose of medical diagnosis or treatment. *Id.* at 376–78, 458 P.3d at 954–56.

Pertinent to this case was our determination in *Christensen* that the twins' statements from the CARES interviews were admissible "because their statements . . . [were] gleaned from a process designed to aid and inform treatment and diagnosis of the child's medical condition." *Id.* at 379, 458 P.3d at 957. We recognized that "CARES interviews serve a dual medical and forensic purpose," noting that in the hearsay context, "the 'forensic' moniker given to these interviews does not supplant the prevailing medical underpinning which supports their admission under Rule 803(4)." *Id.* at 379–80, 458 P.3d at 957–58. "Stated another way, while there is clearly a dual purpose to CARES interviews, to both gather information and inform medical treatment, the information-gathering purpose does not override the medical necessity of such interviews." *Id.* at 380, 458 P.3d at 958. We stressed that the CARES interviews have a *dual* purpose—serving both medical and forensic needs—but that the CARES interviews in question were predominantly medical for purposes of Rule 803(4). This decision was on par with our statement in *Hooper* that "such interviews" have a two-fold purpose: "medical treatment and forensic use," with statements made to medical professionals having "frequently been held to be nontestimonial when the primary

purpose was treatment, even where police officers referred the child to the medical personnel." 145 Idaho at 145, 176 P.3d at 917.

Our decision in *Christensen* remains the rule when addressing CARES interviews in the hearsay context. However, while the State would have us read *Christensen* as recognition that CARES interviews are purely or predominantly medical in purpose, we have not abandoned our prior statements that CARES interviews—as well as similar interviews of abuse victims—serve *dual* purposes, both medical and forensic. *Christensen* may be generally instructive here to understand and distinguish the dual medical and forensic nature of such interviews, and informs our analysis of K.B.'s interview under the primary purpose test, but it is not a case that stands for letting a medical hearsay exception eclipse a defendant's Sixth Amendment right to confront the witnesses against him.

"The Confrontation Clause categorically entitles a defendant *to be confronted with the witnesses against him*; and the primary-purpose test sorts out, among the many people who interact with the police informally, *who is acting as a witness and who is not*." *Clark*, 576 U.S. at 253 (Scalia, J., concurring). Undoubtedly, CARES provides a crucial service to our state and community by helping children disclose horrific abuse and begin treating their trauma. To reduce the need for a child to repeat the story—and incur that trauma—multiple times is a noble and challenging mission. Yet the weight of the factors before us establishes that K.B.'s statements in the first CARES interview were primarily for a testimonial purpose of establishing and gathering evidence against Parsons rather than treating K.B.'s medical needs, and thus implicated the defendant's constitutional rights. To accept the State's argument and tip the scale the other way risks "smuggl[ing] longstanding hearsay exceptions back into the Confrontation Clause," *see id.* at 253, and undermining a fundamental right that predates our Constitution. It is only outside the scope of the Confrontation Clause that the admissibility of a statement becomes the concern of our state rules of evidence. *Bryant*, 562 U.S. at 359.

Also pertinent to our decision today is *Clark*, where the U.S. Supreme Court addressed hearsay statements from a victim of child abuse, and whether the child's statements to his teachers were testimonial and implicated the Confrontation Clause. 576 U.S. 237. The *Clark* decision dealt with two small children (L.P., a 3-year-old boy, and A.T., an 18-month-old girl) who were violently abused by the mother's boyfriend, Clark, when they were left in his care. *Id.* at 240–41.

16

While at preschool, teachers noticed marks on L.P.'s body that indicated abuse. They asked, "Who did this? What happened to you?" L.P. indicated Clark was his abuser, and the teachers contacted a child abuse hotline. *Id.* When Clark came to collect L.P. from school, Clark had a " 'stare-down' with the social worker," and "bolted out the door with L.P." *Id.* at 246 n.2. Social services found the two children the next day and took them to the hospital for treatment of multiple injuries. *Id.* at 241, 246 n.2. L.P. did not testify at trial, but the State introduced his statements to his teachers as evidence of Clark's guilt. *Id.* at 241. Clark moved to exclude L.P.'s statements under the Confrontation Clause, which was denied by the trial court. *Id.* at 242. A jury convicted Clark on multiple counts of abuse and the trial court sentenced him to 28 years imprisonment. *Id.* On appeal, Clark's judgment of conviction was reversed by the Ohio Supreme Court, which ultimately determined that "L.P.'s statements qualified as testimonial because the primary purpose of the teachers' questioning 'was not to deal with an existing emergency but rather to gather evidence potentially relevant to a subsequent criminal prosecution.' " *Id.*

The U.S. Supreme Court reversed this decision. It applied the primary purpose test, explaining that "[i]n the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " *Id.* at 245 (brackets in original) (quoting *Bryant*, 562 U.S. at 358). The Supreme Court focused on several factors to conclude that L.P.'s statements were not testimonial. First, L.P.'s statements occurred in an ongoing emergency where his "teachers needed to know whether it was safe to release L.P. to his guardian at the end of the day," and "they needed to determine who might be abusing the child." *Id.* at 246. The immediate concern and purpose of the questioning "was to protect a vulnerable child who needed help" by "identifying and ending the threat." *Id.* at 247.

Likewise, in *Clark* there was no indication that the conversations were to gather evidence for the abuser's prosecution. Indeed, the fact that L.P. was speaking with his teachers, rather than law enforcement, was a "highly relevant" factor to establish the nontestimonial context of the child's statements. *See id.* at 249. The Court explained that "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Id.* L.P.'s age was also an important factor to the Court because "[s]tatements by very young children will rarely, if ever,

17

implicate the Confrontation Clause." *Id.* at 247–48. Part of this reasoning was that "[f]ew preschool students understand the details of our criminal justice system." *Id.* at 248.

In sum, like *Christensen*, *Clark* is distinguishable by its facts from the case at bar. *Clark* contemplated an ongoing emergency where teachers needed to quickly ascertain whether it was safe to release a three-year-old boy into the hands of his caretaker at the end of the day. The statements were informal and made to protect a vulnerable child from an imminent threat. While the dissent analogizes K.B.'s situation to L.P.'s, it fails to frame *Clark* in this emergency light. There is simply no evidence that K.B.'s CARES interview was part of an ongoing emergency or that she was at risk of *imminent* harm. K.B.'s interview occurred well after her emergency room visit and first contact with police, and weeks after her mother had left the apartment they shared with Parsons. K.B. had been removed from her abuser's reach and investigations were proceeding against him. Further, while still a young child, K.B. was two years older than L.P. at the time she made her statements. As any parent knows, there is a significant difference between the awareness and understanding of a five-year-old and that of a three-year-old. This was evidenced in the second CARES interview when K.B. danced for Foster to celebrate the fact that her statements put Parsons in jail. K.B. may have initially thought she was talking to a doctor, but many of the things she was asked to discuss were not medical.

We also note with concern that the district court's analysis, as well as the State's argument on appeal, improperly introduce a subjective factor to conclude that K.B.'s statements were not testimonial because she *did not intend* them to be a substitute for trial testimony. We recognize that *Clark* states that "it is extremely unlikely that a 3-year-old child in [the victim's] position would *intend* his statements to be a substitute for trial testimony," and that "a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all." 576 U.S. at 248 (emphasis added). However, the Supreme Court's mention of a child's intention was clearly not meant as a subjective finding about the specific three-year-old child in that case; it was just a general example used to explain the justification for the rule. As was established by the U.S. Supreme Court in *Bryant*, the primary purpose test is objective, not subjective, and *Clark* should be read in that light. A court's relevant inquiry in assessing the "primary purpose of the interrogation" is to determine "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and

18

actions and the circumstances in which the encounter occurred." *Bryant*, 562 U.S. at 360. Courts should not engage in a subjective analysis of whether a participant's statements were actually intended to be used for prosecution, or not. *Id.*

Based on the foregoing facts, the videotaped statements made by K.B. in the CARES interview were testimonial. We reach this conclusion based on our decision in *Hooper*, as well as the decisions of *Crawford*, *Davis*, *Bryant*, and *Clark*. This is not the "application of hindsight" by the majority, based on the mere fact that because the statements were ultimately presented to a jury "they were obviously testimonial," as suggested by the dissent. Rather, the totality of the circumstances shows that the primary purpose of eliciting K.B.'s statements during the first CARES interview was to establish or prove past events potentially relevant to later criminal prosecution rather than to provide medical care, as the State contends. Thus, K.B.'s statements are admissible only if she were unavailable and only if Parsons had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 68 ("[T]he Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination"); *Hooper*, 145 Idaho at 146, 176 P.3d at 918. Since Parsons had no prior opportunity to cross-examine K.B., it was error to admit the CARES interview at trial. Of note, the State was well prepared to have K.B. testify at trial, much like she had at the grand jury proceedings, and this time with the assistance of a support dog. Had the State proceeded with its original course, and pursuant to *Hooper*, we would likely have no error to review.

We caution that this decision should not be read as being hostile to victim interviews like the CARES interview at issue here. We reiterate that such interviews can serve important "dual medical and forensic purposes." *Christensen*, 166 Idaho at 379–80, 458 P.3d at 957–58. As we explained in *Hooper* and *Christensen*, such interviews are admissible at trial when properly conducted and offered as evidence in a manner consistent with the defendant's Sixth Amendment rights. Here, the circumstances surrounding this interview and its admission at trial fall short of the Sixth Amendment standard, requiring us to vacate the judgment of conviction. Because this issue is dispositive to the case at bar, we need not address Parsons' remaining issues on appeal.

### IV. CONCLUSION

For the foregoing reasons, we conclude that the introduction of K.B.'s statements from the first CARES interview violated Parsons' rights under the Confrontation Clause. Based on the

19

totality of the circumstances, the interview—conducted 24 days after the victim was first seen by medical personnel—was testimonial in nature because it was conducted for the primary purpose of developing evidence in an ongoing criminal investigation. Inasmuch as K.B. was an available witness, admitting this video without providing the defense an opportunity to cross-examine her was an error of constitutional magnitude and warrants a new trial. Accordingly, we vacate the judgment of conviction and remand for proceedings consistent with this opinion.

Justices BRODY, ZAHN and STEGNER **CONCUR.**

BEVAN, Chief Justice, dissenting in part.

This appeal involves Parsons' Sixth Amendment right under the Confrontation Clause to confront his five-year-old accuser, K.B., about two recorded CARES interviews admitted at his trial. I agree with the majority's conclusion that Parsons' challenge to the second CARES interview is not preserved. That said, because I believe that K.B.'s statements during the first CARES interview were not testimonial, I respectfully dissent from the majority's holding that those statements implicate the Confrontation Clause.

"The Confrontation Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him.'" *State v. Spencer*, 169 Idaho 505, 512, 497 P.3d 1125, 1132 (2021) (quoting *State v. Stanfield*, 158 Idaho 327, 332, 347 P.3d 175, 180 (2015)); *see* U.S. CONST. amend. VI. "A reviewing court's inquiry under the Confrontation Clause focuses on the nature of the statements being made and whether the statement was testimonial." *Id*. (citing *Davis v. Washington*, 547 U.S. 813, 824 (2006)). "Also, the Confrontation Clause is not triggered unless such testimonial statements are being offered for the truth of the matter asserted in them." *Id.* (citing *Williams v. Illinois*, 567 U.S. 50, 57–58 (2012)).

Although the Supreme Court has not provided a comprehensive definition of "testimonial," the Court has offered some guiding principles, including what it considers a "core class" of testimonial statements. A non-exhaustive list of statements within that class includes:

> [E]x parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; . . . "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois*, [502 U.S. 346, 365 (1992)] (THOMAS, J., joined

by SCALIA, J., concurring in part and concurring in judgment); "[and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]"
*Crawford v. Washington*, 541 U.S. 36, 51–52 (2004) (citations to briefs omitted).

One notable point from this pronouncement nearly 20 years ago is that these "core" types of statements are viewed from what "*declarants* would reasonably expect . . ." or statements that an "objective witness" would believe about her or his statement's availability for later use at trial. *Id*. (emphasis added). This focus on declarants or an objective witness should not be lost on this Court when analyzing statements made by children to third parties. The declarant's state of mind, (while viewed objectively) should be part of this equation. As Justice Scalia reminded us in *Crawford*, "[t]he constitutional text, like the history underlying the common-law right of confrontation, thus reflects an *especially acute concern* with a specific type of [testimonial] out-of-court statement." *Id*. at 51 (emphasis added). That acute concern is especially borne out in cases involving children, as the Supreme Court noted in *Ohio v. Clark*, 576 U.S. 237, 244 (2015).

In cases after *Crawford*, the Court developed the "primary purpose" test to determine whether a non-core statement is testimonial. *See Davis v. Washington*, 547 U.S. 813 (2006), and *Hammon v. Indiana*, 547 U.S. 813 (2006). In developing this area of the law, the Court recognized that in applying the primary purpose test, a reviewing court must consider "all of the relevant circumstances." *Michigan v. Bryant,* 562 U.S. 344, 369 (2011). Then in *Ohio v. Clark*, a case involving a child's statement to his teachers, the Court elaborated that a statement is testimonial if the circumstances objectively demonstrate that the "primary purpose" of the statement "is to establish or prove past events potentially relevant to later criminal prosecution." *Clark*, 576 U.S. at 244. If that purpose is not present, the statement is non-testimonial, and its admissibility is governed by state and federal rules of evidence, not the Confrontation Clause. *Bryant*, 562 U.S. at 359. As applied here, I disagree with the majority that the primary purpose of K.B.'s statements during the first CARES interview was to establish or prove past events potentially relevant to a later criminal prosecution. Absent that primary purpose, Parsons' right to confront K.B. is not violated by admission of her statements to the CARES interviewer.

I view the primary purpose test as recognizing that a statement may be given under circumstances that have more than one purpose. We recognized this truth in *State v. Christensen,* 166 Idaho 373, 379, 458 P.3d 951, 957 (2020) ("CARES interviews serve a dual medical and

forensic purpose. . . .”). The majority glosses over the “primary” nature of the analysis. “Primary” means “of first rank, importance, or value: PRINCIPAL” (*Primary*, MERRIAM-WEBSTER (2022)).

In maintaining that the primary purpose of the first CARES interview was to gather statements that would substitute for K.B.’s testimony in court, Parsons argues, and the majority agrees, that *State v. Hooper*, 145 Idaho 139, 176 P.3d 911 (2007), controls this case. Parsons argues that “just like in *Hooper*”: (1) “the examination was arranged by police detectives”; (2) the examination was “conducted by forensically trained personnel”; (3) the detective observed the examination; (4) K.B. “was presented with a series of rules about telling the truth”; (5) “the interviewer consulted with the detective during the interview”[2]; (6) the interviewer did not ask K.B. about any physical injuries; and (7) “there was no evidence presented that the detective observed the medical portion of the exam.”

But we explained in *Hooper* that “referral by police officers, in and of itself is not of great significance, absent evidence of the purpose of the referral.” *Hooper*, 145 Idaho at 145, 176 P.3d at 917. Along similar lines, we made clear that “the fact that an interviewer has forensic training, does not, in and of itself, make the statements ‘testimonial’ in nature.” *Id.* Indeed, that the interviewer was trained (a fact we welcome in any case involving interviewing children) and that the interviewer discussed the importance of telling the truth (again, an important factor in any child’s interview), doesn’t transform this exercise into a testimonial setting in which five-year-old K.B. assumed the role of an in-court accuser. Thus, I would conclude that Parsons’ first, second and fourth arguments are of little moment.

Even setting aside these points, I would note that no evidence established that the STAR interview in *Hooper* was intended to assist in medical treatment, whereas the CARES interview was conducted for that purpose here. Of importance are two distinctive facts in *Hooper* that never occurred in K.B.’s first interview: (1) A.H.’s interview occurred after her medical examination, not before; and (2) the nurse/interviewer left the child alone in the interview room to consult the detective and then returned to ask more questions.

K.B.’s first CARES interview was entirely different. It was conducted by Lara Foster, a trained medical social worker. Dr. Amy Barton observed the interview via closed-circuit television

---

[2] While the interviewer spoke with the detective during K.B.’s second interview, there is no evidence that the detective interrupted the first interview.

and established the scope of the medical services K.B. needed based on K.B.'s answers to Foster's questions. This information-gathering step was followed immediately by Dr. Barton's medical examination and a psychological examination. None of these facts are present in *Hooper*. Moreover, before the interview, K.B. was told that the purpose of the interview was that Foster was working with the nurses and doctors to "help make sure that [children's] bodies are safe and healthy." K.B. understood this, remarking to Foster that she was "the best doctor ever." Thus, as the district court found, "the interviews were conducted by CARES employees, not law enforcement," and there is no evidence that law enforcement interfered or intruded in the first interview whatsoever. No questions were suggested by law enforcement, and law enforcement was not involved in the process, other than scheduling the interview and observing it from another room via closed-circuit television. These factors also readily separate this Court's holding in *Hooper* from this case.

In *Hooper*, six-year-old A.H. was never told that the purpose of the STAR interview was medical. And this Court concluded that the circumstances of the interview demonstrated its primary (if not only) purpose was to "establish or prove past events potentially relevant to later criminal prosecution," rather than meeting the child's medical needs. *Hooper*, 145 Idaho at 145–46, 176 P.3d at 917–18. Indeed, at the beginning of the interview, A.H. was shown the camera at the STAR Center and told

> [t]hat's where my special camera is and that makes it so I don't have to write everything down we talk about, cause I forget stuff sometimes, okay? . . . [A]nd my friend John [Detective Plaza] is watching to make sure that I remember to ask all the questions I need to ask, okay?

145 Idaho at 145, 176 P.3d at 917. This focus on the forensic nature of the interview, with no reference to any of the medical factors present here, makes *Hooper* an entirely different case than this one. Rather than what A.H. knew during her interview in *Hooper*, K.B. was unaware that law enforcement participated in "keeping her safe" in any way. Detective Raddatz testified that she set up the CARES interview, but that before seeing K.B. at the first CARES interview, Raddatz had never met K.B., and she did not believe that K.B. saw her before that interview started.

In addition, the district court noted,

> K.B. is only five years old and there is no evidence (or assertion by the Defendant) that she is familiar with the criminal justice system or intended her statements to be a substitute for trial testimony. On the contrary, as in *Ohio v. Clark*, it is likely that

23

a young child in K.B.'s 'circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all.' [quoting *Clark*, 135 S. Ct. at 2182]. In addition, the interviews were conducted by CARES employees, not law enforcement. K.B. was informed that the purpose of the interviews and the medical examination were to make sure that she was safe and healthy.

Thus, K.B.'s CARES interview, while observed by Detective Raddatz, was not directed by the detective. Instead, Dr. Barton watched K.B.'s first interview via closed-circuit television to gather information that would assist her medical evaluation that immediately followed, as I have noted. Dr. Barton testified at trial that her observations during the first interview "identified disclosure of child sexual abuse." Based on the interview, Dr. Barton recommended that K.B. receive counseling services by a therapist with experience in treating abused children. These facts place this case not just in another lane than the one in which *Hooper* traveled–they place this case on another roadway altogether; a roadway that leads to but one conclusion: the primary purpose of the CARES interview, and of obtaining K.B.'s statements, was to inform those viewing the interview and particularly to enlighten the medical provider entrusted to "keep her safe." *See Clark*, 576 U.S. at 245.

It is also worth mentioning that *Hooper* was decided before the United States Supreme Court's decision in *Clark* and this Court's decision in *Christensen*. *Clark* involved statements made by a three-year-old to a preschool teacher alleging abuse. *Clark*, 576 U.S. at 246. The circumstances there involved pre-school teachers who needed to know whether it was safe to release the child. The later questions from the teachers, according to the Court, were intended to identify who was abusing the child and to protect the child from further abuse; the teachers' intent was not to create an out-of-court substitute for trial testimony. *Id.* at 247. In reaching that decision, the U.S. Supreme Court declined to adopt a categorical rule that would exclude statements to non-law enforcement from the Confrontation Clause, yet the Court noted that "such statements are much less likely to be testimonial than statements made to law enforcement officers." *Id.* at 245. The Court also explained that "[i]n the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Id*. at 245. The child's young age helped evaluate the primary purpose of the statement. The Court explained: "Statements by very young children will rarely, if ever, implicate the Confrontation Clause." *Id*. at 247-48. Indeed, the Court elaborated

that it was unlikely that a young child who is the victim of sexual abuse would intend her statements to be a substitute for trial testimony and, instead, "would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all." *Id*. at 248.

Justice Scalia, with whom Justice Ginsberg concurred in the judgment in *Clark*, also noted the inability of a young child to form a subjective purpose of invoking the "coercive machinery of the State against the defendant" (while focusing, again, on the child's subjective views in giving his statement):

> L.P.'s [the child's] primary purpose here was certainly not to invoke the coercive machinery of the State against Clark. His age refutes the notion that he is capable of forming such a purpose. At common law, young children were generally considered incompetent to take oaths, and were therefore unavailable as witnesses unless the court determined the individual child to be competent. Lyon & LaMagna, The History of Children's Hearsay: From Old Bailey to Post–*Davis,* 82 Ind. L.J. 1029, 1030–1031 (2007). The inconsistency of L.P.'s answers—making him incompetent to testify here—is hardly unusual for a child of his age. And the circumstances of L.P.'s statements objectively indicate that even if he could, as an abstract matter, form such a purpose, he did not. Nor did the teachers have the primary purpose of establishing facts for later prosecution. Instead, they sought to ensure that they did not deliver an abused child back into imminent harm. Nor did the conversation have the requisite solemnity necessary for testimonial statements. A 3–year–old was asked questions by his teachers at school. That is far from the surroundings adequate to impress upon a declarant the importance of what he is testifying to.

*Clark*, 576 U.S. at 251–52 (Scalia, J. and Ginsburg, J., concurring in the judgment). This logic is indistinguishable from what occurred here, other than K.B. was two years older than L.P. at the time of making her statements. This view supports my own, that when dealing with interviews involving young children it is imperative to consider the age of the declarant, and that here, K.B. was absolutely incapable of forming a purpose to make statements that were testimonial. As noted above, the district court recognized this truth as well in analyzing K.B.'s statements.

The majority rejects this "subjective" information being considered when determining the primary purpose of K.B.'s statements; but the age of the child was a critical factor in *Clark*, both for the majority and for the concurring justices just cited, as persuasive evidence in analyzing the *federal* Confrontation Clause. Given the makeup of the Court in reaching the *Clark* decision, each justice supported the notion that "statements by very young children will rarely, if ever, implicate the Confrontation Clause." *Id*. at 238. We state courts would do well to follow suit, and I

25

underscore these principles as part of the totality of the evidence we must consider in making this decision.

After the U.S. Supreme Court decided *Clark*, this Court addressed a case with similar undertones in *State v. Christensen*, 166 Idaho 373, 458 P.3d 951 (2020)*.* Though *Christensen* was not a case about the Confrontation Clause*,* this Court explained that a CARES interview, which consists of a forensic interview, a psychosocial assessment, and a medical examination, "is not primarily designed to gather evidence, though that is one of its byproducts; it is to help inform the medical process that takes place with the child throughout their experience at CARES." *Id.* at 380, 458 P.3d at 958. The Court noted in conclusion:

> Finally, and most importantly, even though CARES interviews serve a dual medical and forensic purpose, A.M.O. and A.G.O.'s statements were admissible because their statements remain inherently reliable; they are gleaned from a process designed to aid and inform treatment and diagnosis of the child's medical condition. In these circumstances, the child would "still have the requisite motive for providing the type of 'sincere and reliable' information that is important to that [medical] diagnosis and treatment."

*Id*. at 379, 458 P.3d at 957 (internal citation omitted). We thus made clear that, in evaluating whether statements made during CARES interviews are admissible as statements made for medical treatment, the focus is on the nature of the interview and its "primary purpose," not the byproduct that the same information can also inform law enforcement about the extent of the crimes that have occurred in such cases.

While the majority endeavors to distinguish *Clarke* and *Christensen* from this case, when the focus is on the primary purpose test in a case involving a five-year-old child, the outcome is indisputable: K.B.'s interview's *primary* (not sole) purpose was to inform her medical care. Coupling this reasoning with the views of the Court in *Clark*, I would hold that the *primary* purpose of K.B.'s first CARES interview was not to create an out-of-court substitute for trial testimony.

K.B. was a five-year-old child speaking to a social worker about the abuse she sustained. She was not an adult, who, while speaking with law enforcement, could perceive that her statements would be useful at a future trial as evidence against Parsons. The purpose of K.B.'s statements during her interview was to inform providers about the medical treatment she needed, based on the abuse she incurred (again, she thought the interviewer was a doctor), while also

informing Detective Raddatz (unbeknownst to K.B.) of the scope of the abuse in determining the nature of the criminal acts that Parsons committed.

I recognize that CARES interviews serve *dual* purposes, but this case is entirely different from *Hooper*, and the primary purpose was medical, as borne out by the record before us. Given the facts here, can it reasonably be said that the *primary* purpose of the CARES interview was to preserve testimony, through the majority's application of hindsight, simply relying on something akin to "well, K.B.'s answers to interview questions were presented to the jury, so they were obviously testimonial"? This smacks of determining the primary purpose of the interview after-the-fact, rather than based on an objective analysis of what actually occurred at the time of the first CARES interview. *Hooper* remains good law when an interview is a mere substitute for law enforcement's need to preserve out-of-court testimony for later use; but there are *no* facts here that support such a conclusion.

In short, I wholeheartedly join with the majority's acknowledgment of the value of processes like CARES to protect children: "CARES provides a crucial service to our state and community by helping children disclose horrific abuse and begin treating their trauma. To reduce the need for a child to repeat the story—and incur that trauma—multiple times is a noble and challenging mission." *Ante*, p. 477. But the majority turns this recognition on its head, reasoning in almost the same breath that this case "risks smuggl[ing] longstanding hearsay exceptions back into the Confrontation Clause," *Clark*, 576 U.S. at 253. Agonizing over smuggling hearsay exceptions into the Confrontation Clause misses the point when the Confrontation Clause is not implicated in the first place. Thus, I would hold that Parsons' rights under the Confrontation Clause are not implicated here.

In addition, I would also hold, as the district court found, that

> [b]ecause the Confrontation Clause is not implicated, the admissibility of the CARES interviews is governed by the Idaho Rules of Evidence. *See Michigan v. Bryant*, 562 U.S. 344, 359 (2011) ("Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."). The plain language of Rule 803 permits the introduction of material that qualifies under Rule 803(4) "regardless of whether the declarant is available as a witness." Pursuant to Rule 803(4) and *Christensen*, the CARES interview is admissible.

Accordingly, I dissent.